IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 09-cv-02578-MSK-MJW

e.DIGITAL CORPORATION,

       Plaintiff,

v.

PENTAX OF AMERICA, INC.;
HOYA CORPORATION;
HOYA CORPORATION USA;
CANON USA, INC.;
CANON, INC.;
COBY ELECTRONICS CORP.;
COBY ELECTRONICS CORP.;
DXG TECHNOLOGY (U.S.A.), INC.;
DXG TECHNOLOGY CORPORATION;
HTC AMERICA, INC.;
HTC CORPORATION;
IMATION CORPORATION;
KYOCERA COMMUNICATIONS, INC.;
KYOCERA WIRELESS CORPORATION;
KYOCERA INTERNATIONAL, INC.;
KYOCERA CORPORATION;
LEICA CAMERA, INC.;
MARANTZ AMERICA, INC.;
D&M HOLDINGS U.S. INC.;
D&M HOLDINGS, INC.;
NOKIA, INC.;
NOKIA CORPORATION;
PANASONIC CORPORATION OF NORTH AMERICA;
PANASONIC CORPORATION;
SUMMIT TECHNOLOGY GROUP, LLC;
SAKAR INTERNATIONAL, INC.;
SAMSON TECHNOLOGIES CORP.;
TEAC AMERICA, INC.;
VTECH ELECTRONICS NORTH AMERICA, LLC; and

       Defendants.

---

1

## OPINION AND ORDER REGARDING CLAIM CONSTRUCTION

**THIS MATTER** comes before the Court for purposes of construction of terms used in the patents at issue in this action, pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). The Court has considered the parties' Joint Claim Construction Statement (**# 284**), the parties' briefs regarding claim construction (**# 296, 297**), the parties' response briefs (**# 302, 303**), and the evidence and argument received at the *Markman* hearing on January 28, 2011 (**# 370, 372**).

## BACKGROUND

The Plaintiff is the owner of United States Patent 5,491,774 ("the '774 patent"), issued in 1996.[1] The preferred embodiment of the device described in the '774 patent is a handheld device for recording and playing back voice messages and dictation. The device differs from previous examples of dictation devices insofar as it records data to removable, electronic "flash memory" chips, rather than cassettes, hard drives, or other devices with moving parts. In doing so, the device achieves savings in power consumption, size, and weight, among other features, compared to conventional dictation devices. The Plaintiff contends that the Defendants, manufacturers of various styles of digital cameras that also record sound, writing it to flash memory chips, infringe upon the Plaintiff's rights in the '774 patent.

The parties have identified several terms in various claims in the '774 patent that require construction under *Markman*. At a *Markman* hearing on January 28, 2011, the Court heard argument from the parties that clarified, among other things, the Plaintiff's position that one of

---

[1] A second patent, United States Patent 5,742,737, is also at issue in this case, but, for the reasons explained herein, the Court need not reach the claims in that patent.

2

the terms for which construction was sought – namely, the limitation in Claims 1 and 19[2] that flash memory is the "sole memory of the received processed sound electrical signals" – was the "core issue" in the case. At the conclusion of the hearing, the Defendants stated, without objection from the Plaintiff, that there would be no need to construe the remaining terms in dispute if the Court were to construe the "sole memory" term in favor of the Defendants. Accordingly, as the ensuing discussion makes clear, the Court need only construe the "sole memory" claim.[3]

Two items of background information are essential to understanding the import of the "sole memory" term. First, a brief discussion of how the device described in the '774 patent is necessary. As explained in some detail in the patent, and as elaborated upon by the device's inventor, Mr. Norris, at the *Markman* hearing, the device records and stores sound by means of a multi-step process. Sounds are collected by a microphone which converts the sound waves to analog electrical impulses. Those analog electrical signals are passed through a differential amplifier circuit, by which background noise is minimized and the desired voice data is amplified. Next, the amplified sound is directed to an "automatic gain control circuit" that adjusts the sound data to a uniform volume level. The sound data is then sent to an analog-to-

---

[2]Although the challenged limitation appears in both independent Claims 1 and 19, those claims are essentially identical for purposes of the analysis herein, and the Court will hereafter limit its discussion to Claim 1.

[3]For purposes of completeness, the entire term being construed is found in Claims 1 and 19. The relevant limitation language is a device comprising, among other things, "a flash memory module which operates as sole memory of the received processed sound electrical signals and is capable of retaining recorded digital information for storage in a nonvolatile form."

digital converter circuit called a CODEC, emerging as digital data ready for storage.[4]  (At this point, a supplemental feature found in the description of the preferred embodiment and some of the dependent claims, passes the digital data emerging from the CODEC through another circuit, referred to as the "DSP," "digital signal processor," or "digital support processor" in order to compress the data to a smaller size, thereby extending the amount of speech that can be recorded in a given amount of memory.)  The data is then handed off to memory control circuitry that writes the data to the flash memory chip.  For playback operations, the process occurs in reverse – the digital data is retrieved from the flash memory (decompressed by the DSP where appropriate), fed to the CODEC for conversion back to an analog signal, amplified as needed, and played back through a speaker.

The second item of background information necessary to a full understanding of the issues here involves the circumstances by which the "sole memory" limitation entered the patent. The initial patent application contained language claiming only "a flash memory module which is capable of retaining recorded digital information for storage in nonvolatile form"; in other words, the "operates as sole memory of the received processed sound electrical signals" language was not present.  In March 1995, the United States Patent and Trademark Office ("USPTO") rejected the application, finding that Claim 1 (among others) was anticipated by prior art – namely, United States Patent 5,197,052 ("the Schroder patent"), United States Patent 5,394,445 ("the Ball patent"), and references in the Microsoft Press Computer Dictionary.

The Schroder patent, issued in 1991, describes a "personal computer dictation system

---

[4]There is some basis to believe that the device can also operate on a purely analog basis. *Compare* Claim 1 (including "analog-to-digital conversion circuitry") *with* Claim 19 (containing no reference to such circuitry).  It appears that a CODEC is nevertheless necessary in purely analog operations to "cod[e] and decod[e] the analog signal."  5:63; *compare* 5:65 ("CODEC <u>also</u> performs the analog to digital conversion") (emphasis added).

with voice and text stored on the same storage medium."  Among other things, it employs "a personal computer with [a] voice input and a voice output system thereby allowing the computer to be used as an integrated dictation system" that "convert[s] analog signals corresponding to the spoken word into digital signals," which are then "stored in the storage device of the computer." The USPTO noted that the Schroder device contained all of the major components of the Plaintiff's device, except that the Schroder device "teaches storing his digital audio data on either a hard disk, floppy disk or other appropriate device, but does not specifically state storing his digital audio data on a flash memory module."  Nevertheless, the USPTO noted that both the Microsoft Computer Dictionary and the Ball patent "teach using flash memory as an alternative means for storing data."  "Therefore," the USPTO concluded, "it would have been obvious to one of ordinary skill in the art . . . to substitute a flash memory in place of Schroder's hard disk or floppy disk."

In July 1995, Elwood Norris, the inventor of the Plaintiff's device, attended an interview with the USPTO Examiner to address the rejection.  (Mr. Norris was assisted by his counsel at this interview.)  The parties have submitted a one-page Examiner Interview Summary Record from this meeting that indicates that Mr. Norris demonstrated how his product worked, that the participants discussed the Schroder patent and dictionary issues, and that an agreement was reached – namely, "Applicant will amend claims to include limitation that will expressly state that the flash memory module is the sole memory to store the received processed sound electrical signal."  The memorandum acknowledged that "Examiner agreed that such a limitation would overcome Schroder."

A few days later, Mr. Norris submitted an amendment to his application, amending Claim 1 to include the language presently in dispute (and as recited in the interview memorandum).  In

5

remarks concerning the amendment to Claim 1, Mr. Norris sought to clarify that the Schroder device was "designed to take dictation and enable transcription as a word processor, all in one," a device that was "clearly intended for desktop application."  His device, on the other hand, was "a hand-held dictation devices (approximately the size of a credit card)," intended to "discover the solution to development of a portable dictation device."

As to the Microsoft Dictionary issue, Mr. Norris noted that that reference stated that "a disadvantage of the block-oriented nature of flash memory is that it cannot be practically used as main memory."  Mr. Norris pointed out that his device "uses flash memory as its main memory," distinguishing it from the Schroder device which "teaches the use of floppy or hard disks as a storage medium, when the [Norris] invention is directed toward the use of flash memory as the main memory system."  He indicated that, by amending Claim 1 to state that "the invention [includes] flash memory as the sole memory to store the received processed sound electrical signal," it would overcome "any prior art teaching which uses flash memory without another memory system such as RAM."  In discussing Claim 2, Mr. Norris again made the point that the Microsoft Dictionary's definitions were not controlling here, as that dictionary stated that flash memory "cannot be practically used as main memory (RAM)."

## ISSUE PRESENTED

The dispute between the parties here is a relatively straightforward one.  The Plaintiff contends that the "sole memory of the received processed sound electrical signals" in Claim 1 refers to the use of flash memory as the sole means of storing the data that results from the completion of the various processing stages discussed above, but that the device may use RAM as memory to hold data while it processes the sound signals into digital data ready for storage. In contrast, the Defendants contend that the language in dispute should be read to require that

6

flash memory be the sole writeable memory in the device, and that no RAM may be used at any point in the device's operation.

Although the parties have focused their attention on the phrase "sole memory" in the disputed language, it appears to the Court that the true dispute between the parties is over the phrase "received processed sound." The Plaintiff's apparent construction of this phrase is that it refers only to "<u>fully</u> processed sound" data, while the Defendants' construction of the phrase is that it refers to "<u>partially</u> processed sound" data, as well as the finished product.

## ANALYSIS

### A.  Standard of review

The Court begins by acknowledging several precepts that guide the claims construction process.

The fundamental purpose of a patent is to give notice to others of that in which the inventor claims exclusive rights. *Oakley Inc. v. Sunglass Hut International*, 316 F.3d 1331, 1340 (Fed. Cir. 2003). Thus, the focus of claim construction is ascertaining how a reasonable competitor would interpret the actual claim language, not what the inventor subjectively intended the language to claim. *Id.* at 1340-41. The words used in the patent are evaluated to their "ordinary and customary meaning," as would be understood by a person of ordinary skill in the art at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*). In some circumstances, the specification may reveal that the inventor specifically – albeit idiosyncratically – defined a term in a way that might differ from the meaning it would otherwise possess. Where the intrinsic record <u>clearly</u> discloses that the inventor resorted to his or her own peculiar lexicography, the Court will give effect to the inventor's unique idiom; however, where the inventor used particular words without giving a

7

clear indication of an intent to endow them with an unusual meaning, the Court will give those words their ordinary and customary meaning, notwithstanding the inventor's subjective intent to invoke a different definition.  *See e.g. Laryngeal Mask Co. v Ambu*, 618 F.3d 1367, 1372 (Fed. Cir. 2010).

In attempting to give meaning to the inventor's language, the Court "looks to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Phillips,* 415 F.3d at 1314.   Among those sources are: (i) the words of the claims themselves; (ii) the remainder of the patent's specification; (iii) the prosecution history of the patent; (iv) extrinsic evidence concerning relevant scientific principles; (v) the common meanings of technical terms used; and (vi) the state of the art at the time of the invention.  *Id.*  Terms must be construed in light of the entirety of the patent, not just in the context of the particular claim(s) they appear in.  *Id.* at 1313.  In other words, claim language must be read in conjunction with the more general and descriptive specification portion of the patent; indeed, the specification is often "the single best guide to the meaning of a disputed term." *Id.* at 1315.  Because the patent is examined as a whole, the Court assumes that claim terms will normally be used consistently throughout the patent, and thus, the meaning of a term used in one claim can illustrate the meaning of that same term used elsewhere in the patent. *Id.* at 1314.

As with the specification, evidence of the prosecution history of the patent can also be considered as intrinsic evidence of how the USPTO and the inventor understood the patent.  *Id.* at 1317.  The prosecution history reflects "an ongoing negotiation between the PTO and the applicant," and can sometimes demonstrate that the inventor limited or disclaimed some portion of a claim.  *Id.*  At the same time, because the prosecution history predates the final patent

8

language, the prosecution history "often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

Extrinsic evidence of disputed terms – that is, "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises" – can also shed light on the proper construction to be given to those terms, but extrinsic evidence "in general [is] less reliable than the patent and prosecution history in determining how to read claim terms." *Id.* at 1318.  The court in *Phillips* articulated a variety of reasons why a court construing a patent should be wary of relying too heavily on extrinsic evidence, and cautions that, while admissible and potentially probative, courts "should keep in mind the flaws inherent in each time of [extrinsic] evidence and assess that evidence accordingly." *Id.* at 1318-19.

**B.   Construction of "received processed sound . . . signals"**

With these legal principles in mind, the Court turns to the particular disputed language of Claim 1.  Once again, that language requires that flash memory be the "sole memory of the received processed sound electrical signals."

As the Court noted, the key portion of this phrase requiring interpretation is the "received processed sound . . . signals" language, and the parties' dispute turns on whether this language references <u>partially</u>-processed data (in which case, alternative memory structures such as RAM could not be used during data-handling operation), or whether it refers only to <u>fully</u>-processed data (in which case, RAM could be used by the device during processing).

The Court begins by reviewing the specification for evidence that Mr. Norris served as his own lexicographer by ascribing a peculiar meaning to the term "processed."  The specification uses the term "processed" or its variants to describe the output of several individual stages of the device's operation.  For example, the patent states that a microphone element acts

to "receive and <u>processes</u> the audio signal into electrical signals." 3:9-10; 3:66-67 (emphasis added). It describes "audio <u>processing</u> circuitry" as "including circuitry that conditions the analog signal for both recording any playback" – *i.e.* the amplification phase – as well as "the signal [being] <u>processed</u> through an automatic gain control circuit" to normalize volume levels. 6:40-48 (emphasis added). The use of the term "audio processing circuitry" specifically references items 22 and 25 in Figure 1 of the patent, a block diagram of the device's operations. Item 22 is labeled as "signal processing circuitry,"[5] and is located immediately adjacent to the microphone input; similarly, item 25 is labeled as "playback circuitry," located immediately prior to sound output being played through the speaker. By contrast, the patent never uses the term "processed" or its variants when referring to the finished data – *i.e.* amplified and digitized (and compressed, where appropriate) data that is ready for writing to flash memory for extended storage. The specification uses a variety of terms to describe the finished data ready for storage: "recorded digital information," 4:17, 5:14; the "digital signal," 5:37-38; "compressed signal," 5:44; "the data" or "the compressed data," 6:5-19; "information from the DSP," 6:25; "compressed data information,"6:28; and so on, but never describes that data as being the "processed sound . . . signals."

Under these circumstances, the Court finds that Mr. Norris has acted as his own lexicographer, defining the term "processed sound . . . signals" to mean the output of three stages in the device's operation – the conversion of sound waves to electrical signals by the microphone, the operation of the differential amplifier, and the operation of the gain control circuit to adjust volume levels. Once that information is passed through the analog-to-digital

_____

[5]Although they share similar names, the Court does not understand the "signal processing circuitry" identified in item 22 of Figure 1 to be the same thing as the "digital signal processor" identified in dependent Claim 11 or at 5:61-65.

conversion circuitry (and, if appropriate, compression through the DSP), the patent no longer refers to this finished product as "processed sound . . . signals" anymore, choosing instead to usually refer to it as some form of "data" or "digital" information. Accordingly, the phrase "received processed sound . . . signals" must refer to, at most, the output of the differential amplifier and gain control circuits, after which, the sound signals have been "processed." According to the disputed language, flash memory must be the sole means by which those "processed" sounds – the amplified and volume-conditioned signals – are thereafter stored in memory. Thus, the use of some other form of memory, such as RAM, during the further manipulation of these "processed" sound signals, such as the analog-to-digital conversion or the compression phase, is prohibited by the plain language of Claim 1.

Such a conclusion fits squarely with all the remaining evidence in both the intrinsic and extrinsic record. Turning first to the intrinsic record, the notion that Mr. Norris was disclaiming the use of RAM (or other non-flash memory) during the analog-to-digital conversion and data compression phases of his device is consistent with the reasons given by the USPTO for denying the patent and Mr. Norris' concessions made to overcome that denial. The USPTO's position was that Mr. Norris' initial application was anticipated by the Schroder patent because the distinguishing characteristic of Mr. Norris' invention – the use of flash memory as the final storage device – would have been obvious to a person with skill in the art contemplating alternatives to the Schroder device's use of a hard drive or floppy disk for storage purposes. The Plaintiff's present position – that the claimed device differs from the Schroder device insofar as the Schroder device uses a hard drive for storage whereas the Norris device uses flash memory – presents precisely the same contention that the USPTO considered and rejected in ruling on Mr. Norris' initial application. Presumably, Mr. Norris could have stood his ground and directly

challenged the USPTO's reasoning that hard drives and flash memory were obvious alternatives to each other in this context, but Mr. Norris instead chose to amend his claim in order to bypass the USPTO's conclusion. Logically, that amendment must therefore refer to something other than the use of flash memory as the storage device for the finished data; otherwise, Mr. Norris' "amendment" was nothing more than a restatement of the position he had previously urged and the USPTO had rejected.[6] Once it is recognized that the amendment, promised by Mr. Norris and accepted by the Examiner, must address something other than the fact that the Norris device uses flash memory for storage and the Schroder device does not, the only logical reading of Mr. Norris' proposed amendment is that it acknowledged that flash memory would replace some other form of memory in the device.[7] Thus, the intrinsic record is consistent with a conclusion that Mr. Norris purposefully amended his claim to claim the use of flash memory instead of

---

[6]The Plaintiff offers an argument that Mr. Norris' demonstration of the device for the Examiner is of some (unclear) significance. Such an argument is unpersuasive. Certainly, the Examiner understood that the use of flash memory, rather than hard drives or other types of storage, was the central innovation of Mr. Norris' application. Thus, a demonstration of how the product worked would have done nothing to resolve the Examiner's concern that flash memory storage was an obvious alternative to the Schroder device's use of hard drive storage. Moreover, the fact that Mr. Norris and the Examiner agreed that some amendment of Mr. Norris' application would be necessary to overcome Schroder indicates that the Examiner's concerns of obviousness persisted even after Mr. Norris demonstrated his device's operation.

[7]The Defendants present a persuasive argument that, indeed, as originally conceived by Mr. Norris, the device is anticipated by the Schroder patent. Schroder's desktop-sized word processor and dictation device combination might be visually distinctive from Mr. Norris' handheld device, but the difference is largely cosmetic. Like Mr. Norris' device, the Schroder device receives sound waves through a microphone, conditions and converts the sound to digital data, and stores it on a permanent storage medium. If one accepts the Examiner's conclusion that hard drives and flash memory are equivalent forms of "permanent storage medium," it is difficult to see how Mr. Norris' device is operationally distinct from the dictation recorder portion of the Schroder device.

Efforts by Mr. Norris and the Plaintiff here to distinguish Mr. Norris' device from the Schroder device without compromising the need to use RAM for microprocessor operations rely entirely on semantics, offering a shifting and somewhat opportunistic definition of the term "main memory."

RAM during the data computation and manipulation phases of operation.

The intrinsic record further supports a conclusion that Mr. Norris admittedly sought to claim a device that abandoned reliance on RAM, insofar as Mr. Norris' statements to the USPTO in July 1995 essentially admit as much. His request to amend his claims represented that the device he was not claiming "uses flash memory as its main memory." The Plaintiff here argues that "main memory" in this context is intended to reference the permanent storage of the final converted and compressed digital data, but this argument is inconsistent with the remainder of the record. Intrinsic evidence indicates that Mr. Norris understood "main memory" and "RAM" to be synonymous. In remarks concerning his request to amend his application concerning Claim 2, Mr. Norris made a reference to using flash memory as "main memory (RAM)." The parenthetical reference to RAM suggests that Mr. Norris understood "main memory" to mean RAM, and vice versa, rather than "main memory" meaning the form by which data is permanently stored. By advising the USPTO that he intended to amend Claim 1 to be read to cover a device that "uses flash memory as its main memory," Mr. Norris indicated to those skilled in the art that the device he was claiming was one in which flash memory, not RAM, was the exclusive memory used by the device for both computational work by the microprocessor and for final storage of the finished data.

Extrinsic evidence further supports the conclusion that persons skilled in the art would have understood Mr. Norris' concession that his amended claim recited a device abandoned reliance upon RAM. Richard Mihran testified at the *Markman* hearing, without contradiction, that persons skilled in the art construed the term "main memory" (sometimes also called "primary storage") to refer to memory such as RAM that a computerized device used when engaging in computations or manipulating data, whereas the term "secondary storage" is used to

13

identify long-term or permanent storage of data, such as by use of hard drives and floppy disks (or, under the Plaintiff's argument, flash memory).  Mr. Norris' own testimony at the *Markman* hearing did not refute Mr. Mihran's assertion; if anything, Mr. Norris acknowledged that "sometimes 'main memory' might be something else in a computer" besides Mr. Norris' conception of it as final storage.  Although Mr. Norris appears to make idiosyncratic use of the term "main memory" in this context, nothing in the patent language or prosecution history would advise a reader of ordinary skill in the art that Mr. Norris was using the term "main memory" to refer to what others in the art understood to instead be "secondary storage."  As a result, the reader would give "main memory" its ordinary meaning in the art, assuming that Mr. Norris was disclaiming any reliance on RAM as the device's memory for performing its data-handling operations.

The Plaintiff argues that this conclusion is misplaced for two major reasons.  First, he contends that any person skilled in the art would implicitly understand, based on the computational tasks performed by the device, that RAM would be required: as Mr. Norris put it, "by the fact that there's DSP in there and other functionality, [like a] microprocessor, it's obvious to anyone with freshman knowledge of electronics, you've got RAM."   In other words, the Plaintiff's position is that RAM is an indispensable component of a device engaging in these types of microprocessor-based computations, and that specifically referencing the presence of RAM in the patent would be superfluous.  However, the unrebutted evidence received from Mr. Mihran at the *Markman* hearing indicated that certain types of flash memory – including the type specifically identified in the '774 patent – could be directly addressed by the microprocessor in the same way that RAM could, such that one could replace that RAM with the appropriate flash memory.  Thus, a person skilled in the art and reading the '774 patent might initially be confused

by the device's apparent abandonment of commonly-used RAM in support of microprocessor operations, but that same reader would then review the characteristics of the flash memory recited in the patent and realize that that flash memory could be addressed by the microprocessor in the same manner as ordinary RAM.  Thus, the mere fact that the types of data-handling operations disclosed in the '774 patent would lead one skilled in the art to assume the presence of RAM does not render the patent's clear disclaimer of RAM to be misleading, as the patent clearly discloses the presence of a functional RAM-alternative.

Second, the Plaintiff argues that Mr. Norris demonstrated the product for the Patent Examiner, and that the product he demonstrated conspicuously included a RAM chip on the circuit board.  However, the testimony at the *Markman* hearing was that Mr. Norris demonstrated a device identified by the parties as Exhibit 6A, a fully-encased version of the device.  Nothing in the record indicates that Mr. Norris opened up the device to demonstrate to the Examiner the existence of operational RAM in it, nor is there any indication that Mr. Norris expressly disclosed to the Examiner that the device contained RAM.  In any event, this argument is unavailing for essentially the reasons discussed above: Mr. Norris agreed, at the conclusion of the meeting with the Examiner, to amend his claims to overcome the Examiner's concerns regarding prior art.  Whatever revelations may have resulted from Mr. Norris' demonstration of a working device were apparently insufficient to permit the Examiner to approve the patent application without some modifications by Mr. Norris, and thus, the fact that he demonstrated a device with RAM at the meeting is irrelevant, insofar as he later agreed to claim a device that did not include RAM.

Accordingly, the Court concludes that the proper construction of the phrase "a flash memory module which operates as sole memory of the received processed sound electrical

signals" is best addressed in two parts. The phrase "received processed sound electrical signals" refers to the electrical signals that have been generated by the microphone and passed through the amplifier and gain control circuits, but have yet to be converted by the CODEC. The remainder of the disputed language requires that the device use only flash memory, not RAM or any other memory system, while engaging the CODEC, DSP (as applicable), and memory control functions, as well as storing the fully-manipulated data.

As noted previously, the parties essentially agreed that a construction of the disputed language in the Defendants' favor would likely be case-dispositive. Although the Court's construction is not precisely aligned with that urged by the Defendants, the Court recognizes that it is nevertheless likely to have that effect. In order to give the parties sufficient time to assess the import of this decision, the Court will grant the parties 30 days to consider how they wish to proceed in light of the ruling. All pending deadlines in this action shall be continued for a period of 30 days. At or before the conclusion of the 30-day period, the parties shall file a joint statement addressing what issues, if any, remain to be addressed.

Dated this 28th day of June, 2011

BY THE COURT:

_____

Marcia S. Krieger
United States District Judge

16